IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 19, 2018 Session

## LESLIE'S POOLMART, INC. v. BLUE WAVE POOL SUPPLY OF MEMPHIS, LLC, ET AL.

Appeal from the Chancery Court for Shelby County
No. CH-16-0892     Walter L. Evans, Chancellor

_____

No. W2017-01894-COA-R3-CV

_____

This appeal concerns an employee who made preparations to start a competing business while still employed by his old company. Todd Heins ("Heins") was a manager working for Leslie's Poolmart, Inc. ("Leslie's"), a nationwide pool supply business, at its Bartlett Hills location in the Memphis, Tennessee area. Jay Karcher ("Karcher"), while a customer in Leslie's Bartlett Hills store, approached Heins one day while he was working with an idea about starting a new pool supply business. Heins was intrigued and followed up with Karcher to found Blue Wave Pool Supply of Memphis, LLC ("Blue Wave"). Heins resigned from Leslie's before Blue Wave opened for business. Heins' friend and Leslie's employee Chad Pitcock ("Pitcock") also resigned and went to work for Blue Wave. Leslie's sued Blue Wave, Heins, Pitcock, and Karcher ("Defendants," collectively) in the Chancery Court for Shelby County ("the Trial Court") for, among other things, breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and inducement to breach contract. After a trial, the Trial Court found in favor of Defendants and dismissed Leslie's complaint with prejudice. Leslie's appeals. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Matthew G. Gallagher and John W. Simmons, Memphis, Tennessee, for the appellant, Leslie's Poolmart, Inc.

James Stephen King, Memphis, Tennessee, for the appellees, Blue Wave Pool Supply of Memphis, LLC; Jay Karcher; Bradley Heins; and Chad Pitcock.

# OPINION

## Background

Leslie's is a nationwide swimming pool supply company that operates a number of retail stores. Todd Heins managed Leslie's Bartlett Hills location in the Memphis area for around seven years before resigning in March 2016. Heins earlier had executed a non-competition and non-solicitation agreement with Leslie's containing the following provisions, in relevant part:

> 2. <u>Noncompetition.</u> While employed with Leslie's, I will not, directly or indirectly, engage or participate in, or render services to, any business or other activity that is competitive in any way with Leslie's without the written approval of Leslie's. Without limiting the generality of the above, I will not, while employed with Leslie's, perform any services for Leslie's customers except in my capacity as a Team Member of Leslie's (or with the written approval of Leslie's).
>
> 3. <u>Customer List and Other Proprietary Information.</u> I acknowledge that Leslie's customer list is the exclusive property of Leslie's. At all times, both during and after my employment with Leslie's, I will keep Leslie's customer list, together with any other proprietary information of Leslie's which may come into my possession, in the strictest confidence and trust, and I will not disclose or use any part of that list or other proprietary information, except as may be necessary to perform my duties as a Team Member of Leslie's. Upon termination of my employment with Leslie's, I will immediately deliver to Leslie's all copies of Leslie's customer list and all copies of any other Leslie's proprietary information then in my possession.
>
> 4. <u>Nonsolicitation of Team Members, Customers and Suppliers.</u> While employed with Leslie's and for a period of one year after termination of my employment with Leslie's, I will not (i) solicit or entice any Team Member of Leslie's to leave the employ of Leslie's, or (ii) solicit, entice or otherwise divert any customer or supplier to do business with myself or anyone in competition with Leslie's; or (iii) take any other action that would unreasonably interfere with Leslie's business relationship with its team members, customers, and suppliers.

In late 2014, Leslie's real estate manager Dong Yi approached Heins to discuss the possibility of Leslie's opening a new store in the Lakeland area. Heins was cool to the idea because it could result in the new store "cannibalizing" sales at the Bartlett Hills location. The plan was shelved.

In April 2015, Karcher entered the Bartlett Hills store to make a purchase. Heins was working that day. Karcher quipped to Heins that the part he was looking for was so expensive, Karcher himself ought to open a pool supply store. Heins responded that the thought actually had occurred to him, too. The two remained in touch and began to formulate plans to realize their idea. Karcher and Heins scouted locations for the new store and ultimately settled on a location two and a half miles east of Leslie's Bartlett Hills location and two and a half miles west of the earlier proposed Leslie's Lakeland location. In this new endeavor, Karcher served as investor while Heins applied his business knowledge. In January 2016, Heins and Karcher filed articles of organization with the Tennessee Secretary of State for their business, Blue Wave.

Heins told Karcher he was considering hiring Chad Pitcock, another Leslie's employee, to come work for Blue Wave. Pitcock also was subject to a restrictive agreement with Leslie's. Nevertheless, on March 14, 2016, Pitcock attended a meeting with Heins and Karcher at SCP Distributors, the agenda of which was to order inventory for Blue Wave. Pitcock was an observer at the meeting but also chimed in with ideas. Around this time, Karcher asked Heins if he was under any sort of non-compete agreement with Leslie's. Heins replied that he was under an agreement of some kind.

Heins, meanwhile, took some shop tags containing customer information from Leslie's, which he later destroyed. Heins used these to contact several customers for Blue Wave. Leslie's also had taken a 2015 Productivity Book home with him from Leslie's and only produced it on the eve of trial in this case. The book contained sales and expense information. Both moves by Heins would prove a source of dispute.

On March 21, 2016 Heins resigned abruptly from Leslie's, and Pitcock followed suit shortly thereafter. On April 9, 2016, Blue Wave opened. In May 2016, Leslie's sued Blue Wave, Heins, Karcher, and Pitcock, seeking damages and injunctive relief, asserting among other things breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and inducement to breach contract. This case was tried in April 2017. Rather than summarize, we quote the testimony relevant to the issues on appeal.

David Morse, a Leslie's manager who replaced Heins, testified to the significance of the productivity book that Heins took:

Q. You were asked some questions about the productivity book. Why wouldn't the productivity book from Jackson have been helpful to you at the Bartlett Hills store?
A. It's pertaining to the weekly revenue of that particular store.

Q. Okay. If you were operating a "D" tier store in the same market as the Bartlett Hills store, for instance, how would it have been helpful to you?

A. It really wouldn't. In a -- on the same market, you're looking at -- for what -- for what the -- for what that provides me, it provides me information on how we're doing, sales wise, at the store. You know, labor, how we're doing at that store. It's very store driven. That -- that stuff that's in the productivity book.

Q. Okay. So is there any way in which you would use it with the store with lower revenue?

A. I can't think of anything, sir.

Q. Okay. How about a competitor's store? Is there any way a competitor could use it?

A. To know what weeks are going to be busy and things.

Q. Okay. Aside from duty times, is there any other way in which the information in that productivity book might be used by a competitor, regardless of the size of their store?

A. It does have in their -- in the productivity book, profit and loss statements. It has in there customer account and other -- other factors like that.

Q. And if -- if there were a competitor that were selling the same products, how would they be able to use that -- that information in that productivity book?

A. It does give us some look of how much of certain products you're selling -- not, specifically, what brand of shock, but it does list in there in the PNL how much shock you're selling and what percentage that is of your total gross sales, things like that, so it would help in ordering products and what they have on hand.

Robert Vance, a forensics expert who testified for Leslie's on the issue of damages, testified as follows:

Q. All right. Mr. Vance, let's walk through your report. Walk us through your background and what you did, how you went about your process, and what your conclusions were.

A. Okay. On page 1 is the background information. It basically just says what I said that I was engaged to do, to calculate damages in if any, if we found any. And then I just identify that there are five retail locations of which Bartlett Hills is one of them, and that's the target store, Store 204, that I was to -- I was to examine, if you will. I did a little background on Leslie's. I took from their website. It's showing that they're a huge company with almost 900 stores nationwide and with a lot of revenue, a lot

-4-

of sophistication. That's basically page 1. And I also noted that the Bartlett Hills store has been here for several decades and it is by far the largest of their retail operations in terms of gross sales and profitability. So that was page 1. Then on page 2 I get into what I call base data which is sort of another background on how I went about doing this project. And the basic theory on -- well, not the theory, but just what its done in economic damage on -- and the intellectual property trade secret type of damages are to disgorge the profits from the Defendant that -- that would have been the Plaintiff's but for the alleged illicit action or the damage or the -- the actions by the Defendant. And so disgorge, meaning the profits would have been and the revenues and the resulting profits would have been those of the Bartlett Hills store or Leslie's Corporate, if you will.

***

In 2015 they were projecting the '16 budget numbers, okay? The '16 -- 2016 projected was a million 688. The actual sales for '15 were a million 592. What actually occurred in 2016 was a million -- 1,222,000 in sales. So they had a drop in actual sales of $370,014. They had drop in -- in sales from the prior year versus what they expected on the budget of about 371,000. All right. So you get what I'm saying. They were projecting about the amount that they had had each year around over a million six, and they ended up with a million two in sales. And so that to me was important to show, and then I asked in-house counsel, Mr. Lindquist: Was there anything that could have made that occur other than competition. They have not identified any new competitors in that area and there were no major construction projects. There was nothing that should have affected that sale other than that competition from Blue Wave. So that's what I discuss on page 2.

***

Q. And the projections of the -- the sales going through the five years, do you just use the last year's current sales for Blue Wave? Is that what that number is?
A. Yes. Yes. As I -- well, as I should have explained, I increased it slightly, the -- the sales of 359,901 that Blue Wave had during the April through December period, because Blue Wave does not have a history, or a financial history, I looked back to the Bartlett Hills location to see what -- how -- what percentage of their sales do they incur for them in April through December. And it's 94.3 percent of sales occurred during that --

-5-

during that nine-month period. That's the hot time, okay? So I took -- so I said: Well, I need to annualize the Blue Wave number into a 12-month period.

Q. Right, because the Blue Wave financials cover actually nine months?

A. Correct, correct. Probably a little less than nine months, but I -- I projected that if I annualize or would gross up that $359,000 number, the annualized number for those January, February, March would be -- the total be 381,493. And so I used that 381,493 for the -- for the five-year projection period with no increases at all. So I multiply that times the 58 percent gross profit number, and each year, the gross profit is 224,421. In -- in the five future years. So then I apply my 10 percent rate, and the total aggregate of future loss is 9 -- 913,771 plus the 211,719 equals total loss of 1,125,490 under scenario 1. That's with no increases. Scenario 2, mechanics are done exactly the same way with the gross up and everything, but I increased the sales based upon Leslie's ROI, or return on investment analysis, which says what a store in that area would have increased had they opened a new store. So in 2017 I used the 20 percent increase number. And in subsequent years it's the 15 percent and 12 percent, 12 and 10. And you can see that in the bottom part of page 6. So what that does -- and I project those out. And each -- the gross profit number in each year is a little different. It goes up a little bit because the sales are going up. So the total future loss under scenario 2 is 1,387,811 plus the current loss of 211,719 equals a total loss under scenario 2 of a mill- -- 1,599,530. You can see all those numbers on page 6 and all that's summarized on page 5. Page 5 has the conclusion, and that has all those numbers that I just -- or it has the -- it has the -- the total lost profit present damage numbers there. So that's the mechanics of -- that's what I went through for that.

Heins testified, among other things, to his view of his duty to Leslie's:

Q. All right. Let me direct your attention to paragraph 4. And paragraph 4 provides that -- and I'm not reading the heading, but I'll start with the text of the paragraph. While employed with Leslie's and for a period of one year after termination of employment with Leslie's, I will not solicit or entice any team member of Leslie's to leave the employment of Leslie's or, two, solicit, entice or otherwise divert any customer or supplier to do business with myself or anyone in competition with Leslie's or, three, take any other action that would unreasonably interfere with Leslie's business relationship with its team members, customers, and suppliers. Now, my question is: Isn't it true that at the time you were meeting with Mr. Karcher

in May and June of 2015 that you knew that your conduct did not conform to paragraph 4 which I just read to you.

A. I was preparing to compete. I wasn't competing. That's clearly what this document says. It doesn't say I can't prepare to compete. It says while I'm employed by Leslie's I can't compete. It doesn't say I can't prepare.

Q. All right. Paragraph 2: While employed with Leslie's, I will not directly or indirectly engage or participate in or render services to any business or other activity that is competitive in any way with Leslie's without the written approval of Leslie -- without the written approval of Leslie. Isn't it true that your conduct with Mr. Karcher violated that before your resignation?

A. No.

Q. All right. Your conduct in selecting a location, your position is it didn't violate that?

A. When I'm not on Leslie's clock, I can do what I want. It's a free country.

Q. All right.

A. If I want to go look at opening a shoe store, I can do that.

Q. All right. When Mr. Karcher came into the store in May of 2015 and you told him you were thinking of opening a store, wasn't that you soliciting Mr. Karcher right there?

A. Incorrect.

Q. You were on the clock.

A. That was general conversation.

Q. Okay.

A. I mean, we can talk about whatever we want. If the cus- -- I mean, I'm there for the customer.

Q. So your position is anything you did off the clock that it's not covered by this agreement?

A. No, if I'm not on their time.

Continuing his testimony, Heins described his meeting with Dong Yi:

Q. Now, do you remember a meeting with a gentleman by the name of Dong Yi?

A. Me and Dong never had a meeting.

Q. Okay. And you were in here when he testified --

A. Yeah --

Q. -- correct?

A. -- I was here.

Q. So it's your testimony --

-7-

A. I'm fully aware.

Q. -- there never was a -- that was false? Never was a meeting?

A. Let me explain -- let me explain something to you real quick about Corporate. To somebody like Dong Yi, even though we're the guys that -- we're the guys that make the dollars for Leslie's, we're nothing to them. When I see him at summits, he doesn't know who I am. So my point is Dong Yi is somebody that walked in my store, talked about a Lakeland location. I never saw him again until a summit.

Q. Okay.

A. So we didn't have a meeting. There was never a meeting.

Q. Okay. Did he come in your store and talk to you about a Lakeland store?

A. He talked about opening a Lakeland store in passing. In other words, he came in my store, stopped by. I bet he wasn't there 10 minutes.

Q. Okay. Did you discuss with him or tell him that you taught [sic] a Lakeland store would do to your Bartlett Hills --

A. Yes, I --

Q. -- store?

A. Yes, I gave him a high number, and the reason why was because I didn't want him to put it there because I knew it would cut into my salary and my bonus.

Q. All right. So you gave him a $500,000 figure?

A. Yes, sir.

Q. So the $500,000 figure you quoted to Dong Yi was your statement to Mr. Yi of what a Lakeland store would take from sales from the Bartlett Hills store, correct?

A. It was a -- it wasn't even a guesstimation. It was just a high figure I threw out there just to basically try to pause the situation. I didn't want him putting a store out there because I knew it would cut in -- because if you start losing sales after the first year, they're going to cut your salary, also going to cut your bonus. That's the way it works.

Regarding why he took the productivity book as well as the shop tags, Heins testified:

Q. All right. So just before we get to the book and what it was -- what it does, where was the book -- why did we get the book yesterday? What happened?

A. Well, I can tell you. Toby Hernandez, which is my former DM, that obviously is no longer with the company, the week before the regional vice president came through the store, told me to get rid of that book, take it out

-8-

of the store. Well, his exact words were: Take this out of the store until John leaves, which is John McCaslin,[1] which was the regional vice president in our district -- or our region at the time.

Q. Okay. And when was that? When did this happen?

A. That was -- 2000-six -- 15. Yeah, right before -- yeah when he was coming through to do his -- his -- basically he comes and checks on the DM, checks on the stores in our -- in our state so --

Q. So what time -- approximately when in 2015?

A. It was -- it was right before -- right after the -- our new fiscal year. And I don't know why he told me to take it out of the store because of the fact -- it wasn't like I was -- you know, I wasn't that far behind if any. And he said: I don't want John to have anything else to -- anything extra to look at. So I think more or less his job was on the line and he didn't want to give him anything to pick at so that afternoon I didn't take it right then, but I took it to my truck that afternoon, you know, so I wouldn't forget to take it out of there because, you know, he had me kind of worried that John was going to be looking for stuff, you know, and maybe get me in trouble is my point.

Q. Okay.

A. So I took it to my track [sic] that night, drove home, took it home: My wife's OCD. I put it under the bed. Never looked at it again.

Q. Okay. And so your testimony is what? What did you do with it after it went under your bed?

A. Well, I moved. I bought a new house in March 18th (sic). So my wife, you know, like I said, she's OCD. She packed everything up. We -- and I was consulting with my lawyer on Saturday. He asked me a couple questions about a certain thing. I said: Well, I think I got a book at home, and then that's where the book came, you know, basically popped up.

Q. Okay. So the book had been -- where did you find the book?

A. I actually found it in my attic.

Q. Okay.

A. Of course, it was packed with master bedroom stuff because that's it was. It was under my bed. So it was packed under --

Q. All right. So what do you use the book for at the store? Your testimony is you took it home approximately, it sounds like, October of 2015. That would have been right after the end of the fiscal year.

A. Yeah, I believe so, yeah.

Q. Okay. And so what do you use the book for at the store?

---

[1] John McCaslin's name appears in the record spelled "McCaslin" and also "McCaustland." We have quoted the name as it is spelled in the record.

A. It's just to keep up with data. I mean, productivity, like what you're doing daily, stuff like that, same stuff you can get off the computer. It's no different.

\*\*\*

Q. All right. Your testimony is that all throughout the time you've worked at Blue Wave you did not remember that you had the Bartlett Hills store book at your house from 2015?
A. I -- I promise. Yeah -- well, I ain't going to promise you.
Q. And you never looked at. It was in the attic. You never accessed any of it?
A. Your witness that you had yesterday, I can tell you every number that I did from -- from my first day as a store manager at Leslie's all the way to now. The witness you had up here yesterday that was -- that is the former manager of the Bartlett store, couldn't tell you his numbers. I can tell you. It's all right here (indicating). And that's how you're successful. So, in other words, if I don't know my numbers, then guess what? I'm going to fail. So I don't need that book. If I went by that book for any plan they I had for Blue Wave, I would fail.

\*\*\*

Q. Now, during discovery in this case we had asked -- I believe we'd asked for things that would have produced this, right? Did you -- did you -- your testimony is you just didn't remember it. You didn't know you had this until it just occurred to you the other day?
A. To be honest with you, that book means nothing to anything that Blue Wave has done. That book is nothing. But to answer your question, no, I forgot -- actually forgot about the book, because I would have presented it to my lawyer early on in the case. I mean, this book just didn't pop up because we thought, you know.
Q. All right. Now, you had access to something called shop tags at Leslie's too, didn't you?
A. Correct.
Q. What are shop tags?
A. Shop tags are when a customer brings in a pool cleaner or, you know, a part that we physically can work on. What they do is we write their name and their phone number so that we can actually contact that customer if -- you know, when the -- when the -- when it's -- the job's completed, they can come pick it up so they can pay for it.

-10-

Q. Okay. So the shop tag would have the customer's name, contact information, potentially other information on it, correct?

A. Potentially, but we never -- we -- they -- we were supposed to fill out address and everything, but all we did was really just do a name and phone number because we normally could get it out within a 24-hour period so we didn't have to really be detailed.

***

Q. Now, after your employment ended you took some of Leslie's shop tags, correct?

A. Correct.

Q. In fact, you took them to Blue Wave, correct?

A. I took them -- yeah, I took them -- yeah, basically, yeah.

Q. All right. And you called those -- the numbers on those shop tags to solicit --

A. Well --

Q -- the people to do business with Blue Wave, correct?

A. That is correct. Let me explain the process. What I did was my DM, same situation, was telling me that, you know, get -- basically, get things cleaned up, and so I took -- I recognized a couple names on the shop tags and, yeah, I took a few with me, yeah.

***

Q. And the shop tags that you used, those were never produced in the case, were they?

A. No.

Q. Those were destroyed; were they not?

A. Well, I mean, after I called the customer I just tore them up and threw them away. I didn't need them anymore.

Q. All right. But you've not been able to identify the customers in your database that were the customers that you called either, correct?

A. As far as -- as far as I can tell, the customers I solicited never -- never showed up.

Q. All right. But you were never able to identify who they were, correct?

A. I know two of them, yeah.

Q. Okay.

A. Just from this case.

-11-

Q. So the -- your statement was the intention was never to compete with Leslie's. But isn't the truth you ended up putting the Blue Wave store two and a half miles from Leslie's store on Highway 64, correct?
A. That is correct.

Pitcock, Heins' friend who also left Leslie's to work for Blue Wave, testified as follows:

Q. Okay. Now, this second conversation with Mr. Heins that you had regarding his plans to leave Leslie's, you came to understand at that time in that conversation, that Mr. Heins was planning to, or anticipating opening his own pool supply store?
A. It was either the second or the third conversation we had, yeah, in March, something like that.
Q. Okay. And you learned at that time that name of the new pool supply store was going to be Blue Wave?
A. Possibly. I do believe so, but it's possible.
Q. All right. And at some point thereafter, Mr. Heins called you and asked you to come to a meeting with SCP; is that correct?
A. Yeah, we went to a meeting.
Q. Okay. And I'm thinking that that meeting was not the Monday before you resigned with Leslie's, but instead the week before; does that sound right?
A. That sounds just about right. So it would have been the 14th, I guess, at that point, if the 21st was when that Monday was.
Q. Okay. And not only did Mr. Heins invite you to that meeting, but you, in fact, attended the meeting as an adviser to Blue Wave; is that right?
A. I went as a friendly favor. You can call it an adviser, I guess, if you want. But I went as a friend.
Q. Okay.
A. Because I knew I was leaving.
Q. Well, I think you testified in your deposition you referred to your role as advisor.
A. I guess you could say that.
Q. All right. And at that meeting, did you, in fact, advise Blue Wave on the purchase of product?
A. On one thing only.
Q. And that one thing, that was the product that Mr. Heins was not going to purchase, and I think you told him, look, every store in Memphis has it, you've got to get it?
A. That's correct.

-12-

Q. Okay. Now, your understanding of the reason that Mr. Heins invited you and wanted you to attend this meeting with SCP was your knowledge of the business, right?

A. I don't know what his exact intentions were, but I would think that would have something to do with it, yes.

Q. That -- that was your understanding?

A. Right. I mean, yeah.

Q. All right. And this meeting -- for the record, this meeting occurred during your employment with Leslie's, you were still employed with Leslie's at that time?

A. I was off that day, but yes, I was employed by Leslie's.

Q. Okay. And before you went to the meeting, I realized the first time you met him, or I believe the first time you met Mr. Karcher was at this meeting with SCP, but you were aware of Mr. Karcher before you went to the meeting; is that correct?

A. If I was, it would had to be just a few days. I don't even know if that's even accurate.

Q. All right. But you knew of Blue Wave, correct?

A. I knew of a pool store. And I think I knew him from being Blue Wave at that moment, yeah.

Q. And you knew that Todd, Mr. Heins, was going to be running Blue Wave, correct?

A. Yes.

***

Q. Tell me about what you advised him on. You mentioned there was one product?

A. It was one part. It was a Polaris part. And it was a part that goes into the side of the wall for a Polaris unit or fitting, and he didn't want to carry that. And I said, man, every store in Memphis has that. Leslie's, Memphis Pool, Hawaiian Pools. You got to have that.

Q. You got to have that?

A. Yes.

Q. And did he agree?

A. Yeah.

Q. And he ended up purchasing it?

A. Yes.

In August 2017, the Trial Court entered its final judgment, into which it incorporated its detailed findings of fact and conclusions of law.[2] The Trial Court found that Leslie's failed to carry its burden and dismissed its complaint. The Trial Court found, in relevant part:

60. Heins resigned from Leslie's on about March 21, 2016. Pitcock resigned on or about March 23, 2017.

61. Pitcock emailed Karcher a copy of the Agreement Regarding Employment Matters on April 3, 2016.

62. Blue Wave opened for business on April 9, 2016.

63. Heins took six shop tags from Leslie's that had the customer name and telephone number. Heins called the customer after Blue Wave opened. Blue Wave made no sales to these customers. He also called two hotels that had made commercial purchases from Leslie's.

64. In 2015 John McCaustland Regional Vice President of Leslie's was coming to Leslie's Bartlett Hills store. Heins District Manager, Toby Hernandez instructed Heins to get the 2015 Productivity Book out of the store, so McCaustland would not have anything "to pick at."

65. Heins testified that he took the 2015 Productivity Book home and stuck it under his bed. Later, as he was moving to a new house, his wife packed the 2015 Productivity Book in a moving box as part of the move. On the weekend before this trial, as he was preparing for his testimony, Heins said he remembered that he had the 2015 Productivity Book. Heins through his attorney delivered the 2015 Productivity Book to Leslie's attorneys without making copies.

66. David Morse, the current Store Manager at Bartlett Hills, testified that Leslie's stores are graded into tiers A through E based on annual sales. Tier A stores such as Bartlett Hills have sales in excess of One Million Five Hundred Thousand Dollars. Tier E stores have sales less than $500,000. If Blue Wave were part of the Leslie's network it would be graded a Tier E store.

67. Morse testified that the 2015 Productivity Book would not be helpful to the operation of a Tier E store.

68. It appears to this Court that neither Heins nor Karcher acted with any malicious intent towards Leslie's. The steps they took to establish Blue Wave were based on a desire to own their own business and not to harm Leslie's.

\*\*\*

---

[2] The Trial Court's "Findings of Fact and Conclusions of Law" is 41 pages long.

71. Defendants contended that if a person walks in to Blue Wave, then that person was a Blue Wave customer. Leslie's contended that if the person had ever purchased an item from Leslie's then the person was a Leslie's customers and if Heins or Pitcock ring up the customers purchase then they have solicited the customer.

72. Neither party has existing contracts with retail customers. The court finds that merely waiting on a former Leslie's customer who walks into Blue Wave is not soliciting, enticing or diverting the customer from Leslie's. Once the customer enter Blue Wave's place of business the customer has made the decision to shop at Blue Wave.

***

83. The court finds that Leslie's customer list was not confidential information as it was developed in public and the list would not provide a competitive advantage to a competitor. The court further finds, that the Defendants did not have Leslie's customer list.

84. Heins admitted that he took six shop tags from the Leslie's prior to his resignation. Heins admitted that he called or attempted to call these customers. Heins testified he made no sales to these customers and there was no evidence that any of these customers made purchases from Blue Wave. Although Heins taking the shop tags was a violation of his contractual duties and fiduciary duties and an incredibly stupid thing to do, Leslie's did not suffer any harm from such breach.

***

90. Leslie's did not meet its burden of proving that Defendants used any of the information claimed as confidential, except for Heins calling the six customers on the shop tags. Regarding Leslie's assertion that Defendants used Leslie's "Other Proprietary Information" to select Blue Waves location, the court rejects such assertion.

91. The court finds as credible, Karcher's testimony that the Shops of Appling Way Shopping Center in Memphis was selected as the location of Blue Wave because it was near Karcher's home which was a requirement for his investment in the project and that the rent was an amount he was willing to pay.

***

-15-

93. Leslie's and Blue Wave engage in ordinary retail sales of pool supplies. Pool Supply salesmen do not go [to] retail customer's homes soliciting business. Leslie's provided Heins and Pitcock with a short two day course to get their Certified Pool Operator certificate, otherwise Leslie's provided no specialized training. Retail customers would come to the pool store of their choice; based on the customer's internal decision making. The retail pricing of pool supply products are not secret. The types of products stocked in pool supply stores is not secret. None of the information Leslie's claims as confidential would make Heins or Pitcock more likely to make a sale to a walk in retail customer. There has been no showing that Leslie's customers tend to associate Leslie's business with either Heins or Pitcock.

94. Leslie's is a national chain of pool stores with over 900 locations nationwide. Leslie's advertises on radio and TV. Leslie's products are branded with Leslie's brands. The court rejects any assertion that Heins or Pitcock are the face of Leslie's to its customers.

95. There are no special factors present in this case that would justify restraining ordinary competition, therefore the court finds the agreement not to solicit Leslie's customers after employment is an unenforceable restraint on trade.

***

130. The court finds that Defendants did not misappropriate Leslie's trade secrets. As previously discussed the alleged trade secrets were not secret. Further, the evidence does not support the conclusion that Defendants used the information that Leslie's complains of to open or operate Blue Wave. Karcher who financed the start of Blue Wave wanted the store located near his home in Bartlett. The items sold in pool stores is not secret as every pool store in the area sold similar products. The inventory was purchased from a local distributor SCP Distributors who provided advice as to what should be purchased. Heins and Pitcock general knowledge of how to run a retail store is not a protectable trade secret. Therefore, the court finds Defendants did not violate the Tennessee Trade Secrets Act.

***

132. The undisputed testimony establishes that Karcher initiated the conversation regarding opening a pool store. Karcher was a customer at the Leslie's Bartlett Hills location. In April of 2015, Karcher was shopping for

an "O" ring when he made an offhand quip to Heins about the high cost of an "O" ring and that he should open a pool store. Heins stated that he had been thinking about opening a pool supply store. Subsequently, Karcher and Heins met for dinner, where they discussed opening a pool store.

133. The course of events raises the question of who solicited. The American Heritage Dictionary defines solicit as "to seek to obtain by persuasion, entreaty, or formal application." In the case at hand Karcher raised the issue of opening a pool store and made an entreaty of Heins to call him if and when he was serious about opening a pool store. The court finds that Karcher initiated the conversation on starting a pool store and that Heins did not breach the Agreement Regarding Employment Matters by responding to Karcher's inquiry.

***

135. In the case at hand, the restriction on competition by Heins and Pitcock during their employment with Leslie's is enforceable. While employed by Leslie's Heins did not advise any Leslie's customer of his intent to resign form Leslie's. While employed by Leslie's Heins did not advise any Leslie's customer of his intent to open a business in competition with Leslie's. While employed by Leslie's Heins sold pool supplies only on behalf of Leslie's. The evidence in the record does not show that Heins was in any way dilatory in performing his duties as a store manager for Leslie's.

136. Heins and Pitcock resigned prior to Blue Wave's opening on April 9, 2016. Blue Waves first sales of pool supplies occurred in April 9, 2016, therefore there was no competition with Leslie's during their terms of employment.

***

139. In this case, Heins actions are preparations to compete with Leslie's postemployment. Examined in it totality, Heins outside his work hours for Leslie's found a location for Blue Wave, located a distributor of pool supplies and ordered inventory for Blue Wave. Heins actions amount to no more than preparations to compete and are not a breach of his fiduciary duty or contractual obligations to Leslie's.

***

-17-

140. At the request of Heins, Pitcock attended the March 14, 2017 meeting with SCP Distributors. Pitcock made a suggestion regarding the purchase of a pool motor part that "every other store in town" carried. The court finds that Pitcock's participation in the conversation was not a material breach of his agreement and did not cause any damage to Leslie's.

***

141. Pitcock testified that he was not going through another busy season with Leslie's. Pitcock intended to return to the University of Memphis to pursue a degree. There was no evidence presented that Heins offered Pitcock a job with Blue Wave while Pitcock was still employed with Leslie's. Pitcock testified he hoped he could get a part time job with Blue Wave after he went back to school, but there was no job offer from Heins. Prior to Pitcock leaving Leslie's Heins had considered offering Pitcock a job, but he did not make an offer of employment to Pitcock. After Pitcock resigned from Leslie's Heins offered Pitcock a job at Blue Wave. These actions do not constitute solicitation.

***

143. Under Tennessee law, to prevail on a claim for inducement or procurement of the breach of a contract the employer must establish: (1) the existence of a legal contract; (2) knowledge of the existence of the contract; (3) intent to induce its breach; (4) the existence of malice; (5) an actual breach of the contract (6) the act complained of must be the proximate cause of the breach of the contract; and, (7) damages must have resulted from the breach of the contract. *Campbell v Matlock*, 749 S.W.2d 748, 751 (Tenn. App. 1987); *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn. App. 1975).

144. Leslie's claim of inducement to breach contract against Karcher and Blue Wave fails because Karcher did not know of the Agreement Regarding Employment Matters, neither Karcher nor Blue Wave had intent to induce Heins or Pitcock to breach their agreements, there was no actual breach of their agreements and Leslie's has failed to prove any damages from the alleged breach.

***

151. Leslie's presented the testimony of Robert Vance a Forensic Accountant. Vance testified that his "approach was to 'disgorge' the sales

that Leslie's alleges were taken by the new Blue Wave store that would have been enjoyed by the Bartlett Hills location, but for the wrong doing of the defendants." Vance's opinion was based on information he was given by Leslie's. Vance concedes that if the information he was given is incorrect it will adversely affect his analysis of damages.

152. Vance testified that he received his information from Leslie's. Vance's testimony evidences that he had been supplied inaccurate or incomplete information. Vance did not interview customers to determine if they were Leslie's customers, Blue Wave customers or why they shopped at Blue Wave. The record is completely silent as to whether any of the 503 Blue Wave customers claimed by Leslie's would have shopped at Leslie's, but for Blue Wave's existence. Vance included in his analysis damages sales to the 793 Blue Wave customers who had never shopped at Leslie's.

153. The court finds that Leslie's is not entitled to damages arising from sales to the 793 Blue Wave customers who never shopped at Leslie's. Vance testified that Blue Wave opened its store in the same space that Leslie's had considered in Lakeland, when Blue Wave store was actually located in Memphis Tennessee some five miles from Leslie's proposed Lakeland location. Vance's calculation of damage took Blue Wave's sales for 2016 and then projected future growth of Blue Waves sales over the next five years. Because he was confused as to the location of Blue Wave, Vance applied Leslie's projected growth in sales for the proposed Leslie's Lakeland store as the growth factor for Blue Wave. Vance made no Examination of whether the decline in sales at Bartlett Hills was caused by a change in management at the store.

***

158. This court, notwithstanding the denial of Leslie's request for relief in this action is of the opinion that Leslie's claims was not made in bad faith under the Tennessee Trade Secrets Act and that Defendants are not entitled to any attorney fees for having prevailed herefor.

Leslie's appealed. In January 2018, this Court entered a show cause order directing Leslie's to obtain entry of a final order. We noted that several of Leslie's claims had not been ruled upon, including those for civil conspiracy and unjust enrichment. The Trial Court thereafter entered an order adjudicating all remaining claims, stating as follows:

> Pursuant to the Court of Appeals' directive, this Court has reviewed each of the claims in Leslie's complaint and has determined that Leslie's

-19-

claims, including but not limited to Leslie's claims for civil conspiracy, intentional interference with employment relationships, and unjust enrichment, should be dismissed with prejudice in their entirety. As to Leslie's request for an order compelling arbitration, the Court finds that Leslie's waived its request for arbitration by submitting all of its claims to the Court for resolution.

IT IS THEREFORE, ORDERED, ADJUDGED, AND DECREED, in accordance with the Court of Appeals' January 18, 2018 Order and Tenn. R. Civ. P. 54.02, that the Complaint should be and is hereby dismissed with prejudice in its entirety and final judgment entered as to all of Leslie's claims for relief. As previously determined, the costs of this cause are assessed to the Plaintiff, for which execution may issue, if necessary.

Leslie's appeal now is properly before us.

## **Discussion**

Leslie's raises a number of issues on appeal, which we restate and consolidate as the following dispositive issues: 1) whether the Trial Court erred in declining to find that Heins and Pitcock breached their employment agreement; 2) whether the Trial Court erred in declining to find that Heins maliciously or unlawfully misappropriated Leslie's trade secrets; and, 3) whether the Trial Court erred in declining to find that Leslie's incurred damages as a result of Defendants' unlawful conduct. For their part, Defendants raise their own issue of whether they should be awarded attorney's fees under Tenn. Code Ann. § 47-25-1705, which permits courts to award the prevailing side attorney's fees in cases where a claim of misappropriation of trade secrets is made in bad faith.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). As regards witness credibility, our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their

-20-

demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

We first address whether the Trial Court erred in declining to find that Heins and Pitcock breached their employment agreement. Associated with the issue of breach is Leslie's allegation that Heins and Pitcock breached their fiduciary duty to Leslie's, as well. This Court had occasion in a prior opinion to discuss an employee's fiduciary duty and duty of loyalty in the context of preparing to compete, stating:

> The evidence at trial demonstrated that Mr. Brown conceived the idea for a company specializing in data collection in 1998, prior to his employment with Dealerskins. Although Mr. Brown did begin discussing and planning Dataium with Mr. Ezell and Mr. Gerber while still employed at Dealerskins, he did not actually take a position with Dataium or speak to any other Dealerskins employees about Dataium until after his termination from Dealerskins. The trial court found there was no breach of fiduciary duty, relying upon *Venture Exp., Inc. v. Zilly*, 973 S.W.2d 602, 606 n. 2 (Tenn. Ct. App. 1998), wherein this Court held that a corporate officer is allowed to prepare to compete prior to his termination from the company without breaching a fiduciary duty. As further stated therein:
>
> > The fact that one was once a director or officer of a corporation does not preclude his engaging in a business similar to that conducted by the company. It is said that it is a common occurrence for corporate fiduciaries to resign and form a competing enterprise and that unless restricted by contract, this may be done with complete immunity, because freedom of employment and encouragement of competition generally dictate that such persons can leave their corporation at any time and go into a competing business. It is recognized that in doing so they can use in their own enterprise the experience and knowledge they gained while working for their former corporation....
>
> *Venture*, 973 S.W.2d at 604 (quoting 18B Am.Jur.2d Corporations § 1713 (1985)). Accordingly, it was not a breach of fiduciary duty for Mr. Brown

-21-

to engage in planning for another business opportunity prior to his termination from Dealerskins. Moreover, it was not a breach of his fiduciary duty for Mr. Brown to accept a position with another company after his termination from Dealerskins. We find no error in the trial court's dismissal of Dominion's claim of breach of fiduciary duty against Mr. Brown, as there was no showing that he assumed a position of conflict with Dealerskins' interests while he was employed there.

***

Dominion argues that the trial court erred in failing to hold that Defendants West, Dopp, and Krabacher had breached their contractual duty of loyalty and good faith. The trial court found that preparing to compete with an employer before resignation or termination does not constitute a breach of the duty of loyalty an employee owes to an employer, and that these employees were merely preparing to participate in a company that does not directly compete with Dealerskins. *See B & L Corp.*, 162 S.W.3d at 205; *Venture*, 973 S.W.2d at 606. Dominion contends, however, that these Defendants should be held to a different standard because they signed contracts that contained a more stringent duty-of-loyalty provision. This provision stated that "at all times during my employment, I owe Trader a duty of loyalty and a duty to act in good faith. I agree that during my employment, I will not individually, or in combination with any other employee, individual, or competitor of Trader, violate or breach the terms of this agreement."

Dominion asserts that Defendants West, Dopp, and Krabacher did more than prepare to compete with Dealerskins. According to Dominion, these individuals also embarked upon a plan to leave their employment with Dealerskins in a choreographed "mass defection" and failed to disclose their true intentions. The evidence demonstrated, however, that the conduct of these defendants did not rise to the level of "preparing to compete," as the business they joined was not a direct competitor of Dealerskins. Upon a careful review of the evidence, we cannot conclude that the trial court erred in determining that the conduct of these defendants in failing to fully disclose their reasons for leaving the employ of Dealerskins rose to the level of bad faith or breach of contractual duty of loyalty. There was also no evidence that Defendants West, Dopp, and Krabacher breached the terms of their respective agreements. This issue is without merit.

*Dominion Enterprises v. Dataium, LLC*, No. M2012-02385-COA-R3-CV, 2013 WL 6858266, at *4-5 (Tenn. Ct. App. Dec. 27, 2013) (footnotes omitted), *no appl. perm. appeal filed*.

The relevant case law reflects that an employee is not prohibited, per se, from preparing to compete post-employment. Competition is, obviously, a key element of the free enterprise system. In the present case, the agreement at issue does not even purport to prevent an employee from competing directly with Leslie's following his or her employment with Leslie's. Leslie's instead argues that Heins breached the employment agreement by taking measures to establish a directly competitive business while still employed with Leslie's. Leslie's also asserts that Heins wrongly enticed Pitcock to leave Leslie's in contravention of his agreement.

This case originated from a spontaneous conversation between Karcher and Heins that evolved eventually into a new business. Karcher had no affiliation with Leslie's other than that of a walk-in customer. It was Karcher who approached Heins. It is the apparent position of Leslie's that Heins, in order to adhere to his contractual duties and fiduciary duty, somehow was compelled to reject Karcher's idea, change the subject, or else resign on the spot if he wished to pursue the idea with Karcher. This is neither what the law requires of employees nor what Heins' contract with Leslie's requires of him.

Had Heins undermined Leslie's in some fashion while Heins still worked for Leslie's, our analysis would be different. That is not what happened, however. Blue Wave did not open for business until after Heins resigned from Leslie's. In the meantime, there is no suggestion that Heins neglected his day to day duties to Leslie's in any way. Heins was within his rights to prepare to compete with Leslie's post-employment. Heins did not compete with Leslie's while he was employed by Leslie's. Indeed, the evidence is clear that Heins performed well while employed by Leslie's.

Just as Heins was free to prepare to compete post-employment with Leslie's, Pitcock was free to join him. The Trial Court found that Pitcock had his own reasons for leaving Leslie's and that Heins did not wrongfully entice Pitcock to leave. With respect to the distributors meeting attended by Pitcock, the Trial Court found his "participation in the conversation was not a material breach of his agreement and did not cause any damage to Leslie's." The evidence does not preponderate against this or any of the Trial Court's relevant factual findings on this or any other issue.

The Trial Court did, however, find a breach of contract with respect to Heins' taking the shop tags, an act the Trial Court described as "a violation of his contractual duties and fiduciary duties and an incredibly stupid thing to do . . . ," an assessment with which we agree. The Trial Court found further, however, that "Leslie's did not suffer

-23-

any harm from such breach." Based on this record, the evidence does not preponderate against that finding, either.

Heins and Karcher conceived an idea to start a new pool supply business. This was a legitimate business endeavor. Heins, apart from his foolish but inconsequential taking of six shop tags, adhered to his contractual duties and fiduciary duty to Leslie's even though he prepared to compete while still working for Leslie's. We find and hold, as did the Trial Court, that in preparing to compete, neither Heins nor Pitcock violated his employment agreement or his fiduciary duty to Leslie's.[3]

We next address whether the Trial Court erred in declining to find that Heins maliciously or unlawfully misappropriated Leslie's trade secrets. Leslie's asserts that Heins misappropriated trade secrets consisting of the following: (1) the idea for Blue Wave's location from the meeting with Dong Yi; (2) the 2015 Productivity Book; and (3) the shop tags containing customer information. Regarding trade secrets, this Court has stated:

> In 2000, Tennessee enacted the Trade Secrets Act which "preempts and displaces conflicting or inconsistent common law in Tennessee regarding the misappropriation of trade secrets." Douglas F. Halijan, *The Past, Present, and Future of Trade Secrets Law in Tennessee: A Practitioner's Guide Following the Enactment of the Uniform Trade Secrets Act*, 32 U. Mem. L.Rev. 1, 5 (2001) (citing Tenn. Code Ann. § 47-25-1708(a) (Supp. 2000)). The Act provides that a plaintiff may obtain an injunction and/or an award of damages for misappropriation of a "trade secret" as defined by the Act. Tenn. Code Ann. § 47-25-1703 and § 47-25-1704. The term "trade secret" has a statutory definition that is similar to the common law definition:
>
> > [I]nformation, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
> >
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

---

[3] Our resolution of this issue serves to pretermit Leslie's claim of inducement to breach contract against Karcher and Blue Wave. As found *inter alia* by the Trial Court relative to this issue, "there was no actual breach of their agreements" to induce, a finding we affirm.

> > (B) Is the subject of efforts that are reasonable under
> > the circumstances to maintain its secrecy
>
> Tenn. Code Ann. § 47-25-1702(4) (2001). The General Assembly adopted a broader definition of "trade secrets" than that found in the national uniform act. Specifically, "Tennessee's definition of 'trade secret' includes any information 'without regard to form, including, but not limited to, technical, nontechnical or financial data.' " Halijan, *supra*, at 21. Thus, Tennessee's definition of a "trade secret" under the Act is more expansive than the standard version of the Uniform Trade Secret Act, and it "is sufficiently broad to include information which at common law would have been considered confidential information." *Id.* at 14.

*Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *5 (Tenn. Ct. App. Aug. 25, 2015), *no appl. perm. appeal filed*.

We already have addressed the matter of the shop tags. Leslie's submits that Heins wrongfully used the secret information he learned from Dong Yi to choose an ideal location for his competing business. Leslie's also derides as implausible Heins' and Karcher's explanations for how the location for Blue Wave's store was picked and Heins' testimony as to what happened with the 2015 Productivity Book. The Trial Court, however, clearly if implicitly credited Heins' testimony on all these matters. We may not overturn a trial court's credibility determination absent clear and convincing evidence to the contrary. Finding no such clear and convincing evidence in this record, we defer to the Trial Court's credibility determination, and therefore, the evidence does not preponderate against the Trial Court's findings on this issue. We affirm the Trial Court in its determination that Heins did not misappropriate Leslie's trade secrets.

We next address whether the Trial Court erred in declining to find that Leslie's incurred damages as a result of Defendants' unlawful conduct. With respect to the breach of contract committed by Heins in taking the shop tags to solicit customers, we have affirmed the Trial Court in finding that this breach did not cause Leslie's to incur any damages. Regarding other alleged damages, we have concluded that neither Heins nor Pitcock breached any contractual or fiduciary duties in preparing to compete. Therefore, even if Blue Wave successfully attracted customers away from Leslie's, this would be in the nature of ordinary competition and not a basis for an award of damages.

As it happened, the Trial Court discounted the evidence on damages presented at trial by Leslie's in the form of Vance's testimony. We note that Leslie's and Blue Wave are both in the retail pool supply business. This is not a case involving, for instance, a

salesperson who assiduously cultivates client accounts, where personal relationships are carefully fostered and jealously guarded. In the case of Leslie's and Blue Wave, customers simply walk into the store and buy pool supplies. In this sense, it is almost a misnomer to speak of a "Leslie's customer" or a "Blue Wave customer," as though they are exclusive clientele. This undoubtedly informed the Trial Court's reasoning as it rejected Vance's analysis, when the Trial Court stated: "The record is completely silent as to whether any of the 503 Blue Wave customers claimed by Leslie's would have shopped at Leslie's, but for Blue Wave's existence." In any event, as we have found, the question of damages is immaterial because Leslie's is not entitled to damages arising from any decline in its sales resulting from the arrival of Blue Wave because such would be the consequence of ordinary competition and not because of any wrongdoing by Defendants.

The final issue we address is Defendants' issue of whether they should be awarded attorney's fees under Tenn. Code Ann. § 47-25-1705, which permits courts to award the prevailing side attorney's fees in cases where a claim of misappropriation of trade secrets is made in bad faith. "If: (1) A claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees to the prevailing party." Tenn. Code Ann. § 47-25-1705 (2013).

Heins was not blameless in this case. Heins breached his contractual and fiduciary duties in taking the shop tags even though the Trial Court found, as do we, that Leslie's suffered no harm from the breach. Leslie's had a reasonable basis on which to bring its claim for misappropriation of trade secrets, even if it failed to obtain its desired relief. We, as did the Trial Court, decline to find that Leslie's brought its misappropriation of trade secrets claim in bad faith. We, therefore, also decline Defendants' request to remand for an award of attorney's fees. We affirm the judgment of the Trial Court in all respects.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Leslie's Poolmart, Inc., and its surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE